IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JUSTIN STUGART                    :

    Plaintiff                     : Case NO. 3:14-CV-1291

    v.                            :

Commissioner of Social Security   : (Honorable Richard P. Conaboy)

    Defendant                     :

_____

**Memorandum**

We consider here Plaintiff's Appeal of a denial of Disability
Insurance Benefits ("DIB") under Title II of the Social Security
Act ("ACT") 42 U.S.C. §§ 401-433 (Doc. 1).  The Administrative Law
Judge ("ALJ") who evaluated the claim found that the Plaintiff had
the Residual Functional Capacity ("RFC") to perform light work with
certain limitations and that such work was available to Plaintiff
(R.12-21).  Thus, the ALJ denied Plaintiff's claim for DIB.
(R.21).  Plaintiff's Appeal is based upon two assertions: (1) that
the ALJ erred in his assessment of Plaintiff's RFC; and (2) that
the ALJ erred in giving insufficient weight to the Plaintiff's
testimony regarding his level of pain and physical limitations.
(Doc. 12, 3-6).  For the reasons discussed below, we determine that
this case must be remanded for further clarification by the ALJ.

**I.  Background.**

   **A.  Procedural Background.**

On November 17, 2011, Plaintiff filed an action for DIB

alleging an onset date of January 5, 2011.  (R.128-130).  In the Disability Report, Plaintiff alleges that his disability stems from back symptomology which keeps him in constant pain and limits his flexibility and ability to move around. (R.173-178).  Plaintiff's claim was denied initially by the Pennsylvania Disability Determination Service.  (R.95).  Plaintiff requested a hearing before an ALJ and that hearing was held on September 13, 2012. (R.12).  Present at the hearing were: ALJ Michelle Wolfe; Plaintiff, Plaintiff's Attorney, Norman M. Lubin, and, via telephone, Vocational Expert Gerald W. Keating.  (Id).  The ALJ issued an unfavorable decision on December 10, 2012.  (R.22).  On February 13, 2013, Plaintiff filed a request for review by the Appeals Council.  (R.7-8).  The Appeals Council denied Plaintiff's request on May 6, 2014 (R.1-5) thus confirming the ALJ's decision as that of the Acting Commissioner.

On July 3, 2014, Plaintiff filed an action with this Court appealing from the Acting Commissioner's decision (Doc. 1). Defendant filed her answer and the Social Security Administration transcript on September 3, 2014.  (Docs. 10 and 11).  Plaintiff filed his brief on October 20, 2014 along with a Statement of Medical Facts.  (Docs. 12 and 13).  Defendant filed her response on November 13, 2014.  (Doc. 14).  Plaintiff has not filed a reply brief, the time for doing so has run, and this matter is ripe for disposition.

2

### B.   Factual Background.

Plaintiff was born on June 5, 1982.  (R.48).  He alleges an onset date of January 5, 2011.  (Id).  Plaintiff completed the eleventh grade and subsequently obtained a GED.  (R.48-49).  He last worked as a sawyer at a job where he performed no lifting, was allowed to work in a seated position, and basically operated a set of levers.  (R.69-71). Plaintiff left this last employment due to various back symptoms that necessitated two separate surgical interventions, a lumbar laminectomy and microdiskectomy at L5 in March 2011 and a right L4-L5 laminectomy, foraminotomy and diskectomy on April 25, 2011 (R.16-17).  On August 14, 2012 a surgeon advised Plaintiff that a surgical fusion at L4-L5 "may help your back pain" but also advised that the success rate for such surgery is about 60 to 70%".  (R.493). Plaintiff has not undergone the fusion at the time the record was closed.

### C.   Physical Impairment Evidence.

The medical evidence of record indicates that Plaintiff has a history of low back pain and lower extremity radiculopathy dating back, at a minimum, to January 5, 2011, the date on which he "felt a pop and pain at left low back and left buttock pain" while in the course of pushing a heavy object.  (R.221).  Dr. David Kahler evaluated Plaintiff at Muncey Valley Hospital on January 7, 2011 and diagnosed an acute low back strain with left sciatica and acute low back pain.  (R.226).  Dr. Kahler prescribed a muscle relaxant

3

and pain medication, directed Plaintiff to follow up with his family physician, and suggested he make an appointment with an orthopedic surgeon. (Id).

On January 13, 2011, Plaintiff underwent an MRI of the lumbar spine that was interpreted by Dr. David Quintana to indicate herniations from L3-4 through L5-S1 with the largest at L4-5. (R.235). On February 2, 2011, Dr. Shelly Timmons, a neurosurgeon, examined Plaintiff and reviewed his MRI film and reached essentially the same conclusions as Dr. Quintana but advised Plaintiff to have additional diagnostic testing "to offer him the least amount of surgery to correct his problem." (R.244-45). Dr. Timmons prescribed Vicodin and Carisoprodol to alleviate Plaintiff's low back pain. (R.246).

On March 14, 2011, Plaintiff was admitted to the Williamsport Hospital and Medical Center where he was operated on by Dr. Hani J. Tuffaha. (R.47). Dr. Tuffaha performed a left L3-L4 laminectomy, foraminotomy, and diskectomy along with a left L4-L5 laminectomy and foraminotomy with decompression of the left L5 nerve root. (Id). Dr. Tuffaha reevaluated Plaintiff during an office visit conducted March 23, 2011 and found he was doing extremely well and released him to return to sedentary work effective March 28, 2011. (R.43). However, Dr. Tuffaha noted in his office notes of April 15, 2011 that, on March 30, 2011, Plaintiff experienced "a sudden onset of new severe right leg pain involving the groin and the

4

lateral aspect of the foot and toes." (R.40). Dr. Tuffaha's impression of Plaintiff's condition on April 15, 2011 was "new disc extrusion L4-L5, central and right with intractable severe right L5 radiculopathy." (Id). Plaintiff was prescribed Percocet for his pain until a second surgery could be scheduled. (R.40) Plaintiff's second surgery, another laminectomy, foraminotomoy, and diskectomy at L4-5, was performed on April 25, 2011 by Dr. Tuffaha. (R.478, 480).

Between August 8, 2011 and June 13, 2012, Plaintiff visited the Susquehanna Community Health and Dental Clinic on at least nine occasions. (R.436-454). On each of these occasions he was assessed to be experiencing persistent low back pain, lumber vertebral syndrome, and/or severe low back pain. (Id). Nurse Practitioner Karen Peterman, working in consultation with Christopher Wagner, M.D., noted that claimant's pain worsened with back flexion and twisting movements and that the pain was aggravated by lifting, bending over and getting up from a sitting or lying position. (R.451). During this time he was prescribed various pain inhibiting medications and received a lumbar epidural injection on March 26, 2012. (Id).

The Pennsylvania Bureau of Disability Determination sent Plaintiff for an evaluation by Dr. R. C. Nielsen in December of 2011. (R.413). Dr. Nielsen noted persistent low back, pelvic, and groin pain of "unclear ediology". (R.418). Dr. Nielsen concluded

5

that Plaintiff's prognosis was "fair to good" and opined that
Plaintiff had no limitations with respect to bending, kneeling,
stooping, crouching, balancing, climbing, and that he had no
limitations with respect to standing, walking or sitting; and that
he could lift and carry up to 100 pounds.  (R.418-420).

Despite Dr. Nielsen's rosy assessment of Plaintiff's physical
status, a subsequent consult with Dr. G. Timothy Reiter, Associate
Professor of Neurology at the Milton S. Hershey Medical Center in
March of 2012, caused Dr. Reiter to opine that an additional
surgery - - a fusion at L4-L5 - - may help Plaintiff's back pain.
(R.492-487).  Dr. Reiter also indicated, however, that the success
rate for surgery of this type is only 60-70%.  (R.493).  The record
contains no indication whether Plaintiff continues to contemplate
this additional surgery.

### D.   ALJ Hearing Testimony.

In the SSA's "Function Report-Adult" (R.173-182), Plaintiff
stated, in response to the question of how his injuries and
conditions limited his ability to work, "Not able to move, lift or
get around.  To(sic) much pain constant - - never can find a good
position".  (R.173).  Plaintiff also related that he was not able
to get comfortable and would wake up in pain throughout the night.
(R.174).  He acknowledged that he could prepare frozen dinners for
himself but that he could not stand long enough to prepare complete
meals. (R.175).  He indicated that he could not handle household

chores like cleaning, ironing, laundry, or yard work.  (Id).  He
stated that he was not able to do yard work because he was in too
much pain.  (Id).  He shops weekly for basic things and this takes
him 15-20 minutes.  (Id).  With respect to his interests and social
activities he stated that he could no longer go out and do the
activities he formerly liked due to his pain.  (R.177-78).  He
indicated that he can walk up to 50 yards on a good day but that he
would then have to sit and rest for 10-15 minutes before
continuing.  (R.178).  In response to a question asking him to
identify "unusual behaviors or fears", he stated that he has a
"fear of movement not knowing when or what is going to happen".
(R.179).  He related that he was in pain for some years before the
onset date of January 5, 2011, that his pain is concentrated in his
vertebrae and spreads down his legs and numbs his feet and that the
pain, while worst in the morning, is constant.  (R.181).  He stated
that activities such as lifting, squatting, bending, standing,
reaching, walking, sitting, kneeling and stair climbing affect his
pain level.  (R.178).

    At the hearing before the ALJ in September of 2012, Plaintiff
testified that he has moved in with his father and that his bedroom
is on the first floor.  (R.48).  He stated that he had gained
thirty pounds since his onset date and that he never drives. (Id).
He testified that his original injury predated his onset date and
that he does not receive worker's compensation.  (R.51).  His only

income, as of the date of the hearing, is $550.00 in unemployment compensation that he receives bi-weekly. (R.50). He testified that he filed for unemployment benefits at his employer's direction. (Id).

After describing the two back surgeries he had endured, Plaintiff testified that he saw a "disability physician guy". (R.53). Plaintiff related that this disability physician had him lay on a table and manipulated his legs like bicycles".[1] (Id). Plaintiff stated that he felt worse after his encounter with the disability physician and sought the opinion of a second surgeon in Hershey. (Id). His interpretation of that surgeon's advice was that he requires a fusion at L4-L5. (R.54).

Plaintiff testified further that he takes Oxycodone for pain and another medication for inflammation. (R.58). He states that it takes him 35-40 minutes to get out of bed each morning and that it is his right side that gives him the most trouble. (R.58-59). He also stated that both sides of his body hurt and that he has pain in the groin area. (Id). Finally, he testified that the first two toes on his right foot are totally numb. (Id).

Plaintiff testified that he formerly could cut his father's grass with a self-propelled mower in thirty minutes. (R.60). Now the same job reportedly takes him 4-5 times as long. (Id). He stated that even to do dishes, which he does on a regular basis, he

---

[1] The Court presumes that the "disability physician" is the aforementioned Dr. Nielsen.

8

must alternately sit and stand to complete the task.  (Id).  He indicated that he had an extra handle added to the shower area because, at times, it feels like his right leg is giving out. (Id).

Plaintiff indicated: that he can walk 2-3 blocks without stopping; that when he stands he finds it necessary to hunch due to groin pain; that he can sit for no more than 15-20 minutes before needing to stand; that he carries nothing heavier than a towel; and that he had been incapable of carrying a gallon of milk without feeling as though he was falling forward about a month before the hearing.  (R.61-62).

Upon questioning by his counsel, Plaintiff stated: that he must sleep in the fetal position but, even then, he does not get more than 2-3 hours of uninterrupted sleep; that he needs to rest often during the day; that even after his employer modified his last job so that he could work seated and change his position as often as necessary, he would experience pain so severe that he would be in tears and would need to shut the machine down; and that he does not believe he is capable of performing a sedentary or light duty job on a sustained basis.  (R.63-64).  Plaintiff also indicated that the pain medications make him drowsy, that he tries to take as few of them as possible and that he has a high pain tolerance.  (R.65).

Testimony was also provided by Gerald Keating, a vocational

9

expert.  Mr. Keating testified that he had reviewed Plaintiff's work history prior to the hearing and recounted that history in his testimony.  (R.66).  He then asked Plaintiff for detail regarding the nature of his duties at each of his prior places of employment. (R.66-72).  In response to a hypothetical question from the ALJ, Mr. Keating stated that Plaintiff would be unable to perform any of the jobs he had previously performed.  (R.73-74).  The hypothetical question to which Mr. Keating responded asked him to "assume an individual who has the same age, education, and work experience as the claimant, and has the residual functional capacity to perform work at a light exertional level as defined by the regulations but subject to the following limitations.  The individual is limited to no pushing or pulling with the lower extremities; occasional balancing, stooping, crouching, crawling, kneeling and climbing, but never on ladders, ropes, or scaffolds.  The individual would need to avoid concentrated exposure to temperature extremes of cold, wetness, vibrations, and hazards such as moving machinery and unprotected heights."  (Id). Mr. Keating stated that there were various sedentary jobs (e.g., production assembler, packer, benchworker, telephone receptionist, data entry, etc.) which Plaintiff could perform given the hypothetical limitations imposed by the ALJ.  (R.74-76).

   **E.   ALJ Decision.**

   The ALJ determined that Plaintiff had not been under a

disability between January 5, 2011 and the date of her decision, December 10, 2012.  She made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   The claimant has not engaged in substantial gainful activity since January 5, 2011, the alleged onset date.  (20 CFR 404.1571 et sec., and 416.071 et sec.).

3.   The claimant has the following severe impairments: degenerative disc disease with herniated nucleus pulposus, status-post laminectomy and foraminotomy and radiculopathy (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the list of impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than

11

the full range of sedentary work as defined in 20
CFR 404.1567(a) and 416.967(a).  He would be limited
to no pushing and pulling with the lower
extremities.  He could occasionally balance, stoop,
crouch, crawl, kneel and climb but never on ladders,
ropes, or scaffolds.  He should avoid concentrated
exposure to temperature extremes of cold, wetness,
vibrations, and hazzards, such as moving machinery
and unprotected heights.  He would require a
sit/stand option at will but would not be off task
with transferring.

6.    The claimant is unable to perform any past relevant
work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on June 5, 1982 and was 28
years old, which is defined as a younger individual
age 18-44, on the alleged disability onset date. (20
CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to
communicate in English (20 CFR 404.1564 and
416.964).

9.    Transferability of job skills is not material to the
determination of disability because using the
Medical-Vocational Rules as a framework supports a
finding that the claimant is "not disabled," whether

or not the claimant has transferable job skills.
(See SSR 82-41 and 20 CFR Part 404, Subpart P,
Appendix 2).

10. Considering the claimants age, education, work
    experience, and residual functional capacity, there
    are jobs that exist in significant numbers in the
    national economy that the claimant can perform.  (20
    CFR 404.1569 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability as
    defined in the Social Security Act, from January 5,
    2011, through the date of this decision.  (20 CFR
    404.1520(g) and 416.920(g)).

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[2]  It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.19).

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–-particularly certain types of evidence (e.g., that offered by treating physicians)–-or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits,

15

"to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*,

181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

we note the Third Circuit has repeatedly emphasized the special
nature of proceedings for disability benefits. *See Dobrowolsky*,
606 F.2d at 406. Social Security proceedings are not strictly
adversarial, but rather the Social Security Administration provides
an applicant with assistance to prove his claim. *Id.* "These
proceedings are extremely important to the claimants, who are in
real need in most instances and who claim not charity but that
which is rightfully due as provided for in Chapter 7, Subchapter
II, of the Social Security Act." *Hess v. Secretary of Health,
Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such,
the agency must take extra care in developing an administrative
record and in explicitly weighing all evidence. *Dobrowolsky*, 606
F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases
demonstrate that, consistent with the legislative purpose, courts
have mandated that leniency be shown in establishing the claimant's
disability, and that the Secretary's responsibility to rebut it be
strictly construed." *Id.*

**B.  Plaintiff's Alleged Errors.**

Plaintiff alleges that the ALJ erred in two respects: (1) that
she failed to give proper weight to the Plaintiff's testimony
regarding his level of pain; and (2) that her assessment of the
Plaintiff's RFC is unsupported by substantial evidence of record.
These arguments do merge because the degree of Plaintiff's pain and
his RFC are inextricably intertwined. Nevertheless, we shall

18

review both assignments of error independently.  Our review of the record has persuaded the Court that the Plaintiff's assignments of error are well-supported enough to require a remand of this case.

**1.  Plaintiff's Allegations of Pain.**

The record in this case well establishes that Plaintiff is experiencing severe and chronic pain.  This pain has been documented at various points in time by three treating physicians -- Drs. Kahler, Tuffaha, and Reiter, two of whom, Tuffaha and Reiter, are neurosurgeons.  (See pages 3-6 ante).  Indeed, the ALJ acknowledges in her decision that the claimant has severe impairments including degenerative disc disease, herniated nucleus pulposus, status-post laminectomy, and foraminotomy and radiculopathy.  (R.14).  The ALJ also found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms".  (R.18).  Yet, the ALJ concludes that this well-documented severe and chronic pain is not severe enough to render Plaintiff disabled.  (Id).  The ALJ's decision to partially discredit Plaintiff's testimony regarding the persistence and intensity of his pain is founded principally upon Dr. Nielsen's observation that he found it "interesting" that Plaintiff had been prescribed pain medication two days prior to his consult and that Plaintiff had not yet obtained that medication."  (R.18).  This Court finds it similarly interesting that the Plaintiff has testified that these medications make him drowsy, that he tries to

limit his consumption of them, and that he has a high tolerance for pain. (R.65). [3]  The record also indicates that these medications have not always alleviated Plaintiff's pain. (R.65 and 444). In light of these consideration, the Court does not view Dr. Nielsen's observation about Plaintiff's delay in picking up his medication as particularly probative of the proposition that his pain is less severe than he indicates.

The ALJ states that "the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent" with Dr. Nielsen's RFC assessment. The Court is skeptical of this seemingly cavalier dismissal of Plaintiff's pain level when the record is redolent of objective evidence of structural problems in Plaintiff's back that, by the ALJ's own assessment, "could reasonably be expected to cause the alleged symptoms". (R.18). In our circuit, it has been held that pain alone can result in disability and that "testimony of subjective pain and inability to perform even light work is entitled to great weight, particularly when...it is supported by competent medical evidence". Dobrowolsky v. Califano, supra, at 409. Here, it appears that the claimant's testimony, which is supported by copious objective evidence of impairments which could be expected to produce great pain, was

---

[3] The Court also notes that the medical records document that Plaintiff has taken, at various times since January 5, 2011, Vicodin, Carisoprodol, Percocet, Oxycodone, Robaxin, and Tramodol as well as receiving at least one epidural injection in an effort to combat his back pain.

apparently given very little weight.  Thus, the Court will require a more comprehensive explanation why claimant's testimony was not given "great" weight as required by Dobrowolsky.

**B.    Plaintiff's Allegations Regarding the ALJ's Determination of his RFC.**

The only support in the record for the ALJ's hypothetical question to the vocational expert, which asked him to assume, inter alia, that Plaintiff could perform light work involving "occasional balancing, stooping, crouching, crawling, kneeling and climbing", finds scant basis in the record.  Here again, it appears that the ALJ relied upon Dr. Nielsen in determining the Plaintiff's RFC.  The ALJ stated cryptically:

> In a medical source statement, Dr. Neilsen found no limitations whatsoever.  While great weight is given to Dr. Neilsen's findings on examination, <u>no weight is given to his opinion in the medical source statement.</u>  (emphasis supplied) (R.18).

The Court is struck by the fact that Dr. Nielsen's finding of "no limitations whatsoever" was given no weight, yet the only evidence in the record that could conceivably support the ALJ's hypothetical assessment of the Plaintiff's limitations was necessarily derived from another aspect of Dr. Neilsen's report (R.413, 422).  The apparent contradiction of according no weight to one aspect of Dr. Nielsen's findings and great weight to another must be explained.

21

Thus, it appears to the Court that the hypothetical assumptions that the vocational expert was asked to make were based upon a tenuous foundation.[4] Because it appears that the evidence relied upon by the ALJ is both inherently suspect and also contradicts the objective findings of treating physicians, the Court will require a more detailed explanation regarding how the ALJ determined the limitations that served as the framework of her hypothetical question to the vocational expert.  See Kent v. Schweiker, supra at 114.

C.    **Conclusion.**

The Court, having examined the entire record in this case and having reviewed the ALJ's decision, is not convinced that the outcome here is based upon "substantial evidence of record" that a reasonable mind accept as adequate to support a conclusion as required by Richardson v. Perales, supra.  Thus, the Court will require that the Commissioner provide a revised decision that provides a clearer explanation of why claimant's complaints of pain were deemed to be exaggerated and precisely what elements of the record provide the foundation for the ALJ's determination of Plaintiff's residual functional capacity.  In the alternative, the

---

[4] Particularly striking is Dr. Nielsen's conclusion that this man, who had undergone two low back surgeries in the preceding nine months, could lift and carry up to 100 pounds and stand, walk, push and pull without limitation.  (R.420).  This conclusion strains credulity to the extent that the Court is confounded that any aspect of Dr. Nielsen's Report would be relied upon by the ALJ for any purpose.

Commissioner may issue an opinion awarding the Plaintiff DIB benefits inasmuch as there is certainly substantial evidence of record supporting that outcome.  An Order consistent with these determinations will be filed simultaneously herewith.


BY THE COURT


                                   S/Richard P. Conaboy
                                   Honorable Richard P. Conaboy
                                   United States District Court

Dated: February 18, 2015